**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BERKLEY SPECIALTY INSURANCE COMPANY<br><br>                    Plaintiff,<br><br>v.<br><br>26 MILLER ROAD LLC;  PLATT DEVELOPMENT GROUP LLC; DAVID GAMBONE; KYLE GAMBONE<br><br>                    Defendant. | Civil Action No. 2384CV00545<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT** |

## INTRODUCTION

This is an action for declaratory judgment and related relief.  As set forth below, Berkley Specialty Insurance Company ("BSIC") issued a policy of owners protective insurance to 26 Miller Road LLC ("Miller"), in connection with a property Miller was developing in Dover, Massachusetts. In mid-2023, the owners of the property sued Miller, its principals, and a separate entity, Platt Development Group ("Platt"), alleging defective construction.  For the reasons below, BSIC now  seeks a determination that it owes no duty to defend or indemnify Miller, Platt or their principals with respect to the allegations in the owners' lawsuit (the "Underlying Action", **Exhibit A** hereto).

## PARTIES

1.      BSIC is an insurance company, incorporated in the State of Delaware, with its principal place of business in Scottsdale, Arizona.  It issued Owners and Contractors Protective

Liability Policy No. CGL 0146121, eff. June 18, 2021 – July 18, 2022 (the "BSIC Policy" or "Policy", **Exhibit B** hereto) to Miller as First Named Insured.

2. Miller is a limited liability company, organized in Massachusetts, with its principal place of business at 732 East Broadway, Boston, Massachusetts.

3. Platt is a limited liability company, organized in Massachusetts, with its principal place of business at 732 East Broadway, Boston, Massachusetts.

4. David and Kyle Gambone are Massachusetts residents. On information and belief, they are members, managers or principals of several associated development entities, including Miller and Platt.

5. On information and belief, none of Miller's or Platt's other members, managers or principals, are residents or citizens of Arizona or Delaware.

## JURISDICTION AND VENUE

6. This court has subject matter jurisdiction of this action under 28 U.S.C. §§ 1332, because this is an action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendants are located and have headquarters in Massachusetts, and because a substantial part of the events and communications giving rise to the parties' dispute occurred here.

## FACTUAL BACKGROUND

### The Project

8. Miller was at relevant times the owner of a parcel of land at 26 Miller Hill Road, Dover, Massachusetts (the "Parcel"). In mid-2021, it began development and construction of a residence ("Home") on the Parcel. DiPierro and Brown Construction ("DiPierro") – sometimes also

referred to as DiPierro Construction Inc., or "D&B Construction" – was retained by Platt as general contractor to do this construction and development.

9. In March 2022, when the project was partially constructed, an opportunity arose to sell the Home to two individuals, Amy and Yumin Choi. Later that month, Miller entered into a Purchase and Sale Agreement, and the Chois agreed to purchase the Home for a total of $3.94 million, while work on the project continued.

10. Disputes soon arose. The Chois complained repeatedly that the work on the Home was moving too slowly and was of poor quality. In mid-2022, they terminated Miller and DiPierro; and brought on a new general contractor. The new contractor criticized the work Miller had performed, and provided a report of faulty work that needed to be addressed.

11. On March 3, 2023, the Chois filed a six-count complaint (the "Underlying Complaint") against Miller, Platt, and the Gambones. A copy of the Underlying Complaint, with attachments, is appended hereto as Exhibit A.

12. In the Underlying Complaint, the Chois complain of Miller's and DiPierro's "substandard level of performance in building the [Home]." As examples, they pointed to "floors [that] had holes in them," "paint … chipping on the walls and staining the floors," "numerous installations [that] were uneven and improper," "insulation and weatherstripping issues," ceiling leaks, fungal growth, inoperative electrical receptacles, gaps in baseboards, "poor plaster work, framing, and trim," wiring issues, weatherstripping issues, improper cabinet finishes, code violations (e.g., lack of an accessible electrical box in the Home's kitchen), missing heat vents, missing fireplace sealing, incomplete plumbing, trim issues, hardware issues, poor wall staining, front entry tile problems, and "a pervasive fly and moth infestation that was present during move-in." They speak of a need to rewire the master bedroom, and a need to repaint "most of the Home."

These and other allegations are documented in the Chois' consultant's report, which is appended to the Underlying Complaint as an exhibit.

## Insurance Coverage

13. Construction projects are complex undertakings. Multiple parties are involved. Owners hold title to the land where building is to be done. Architects design structures to comply with building codes. Engineers review the structure's integrity. Developers arrange financing. General contractors coordinate and oversee the work at a site. Additionally, general contractors often hire subcontractors to work on particular parts of the project, and those subcontractors may retain sub-subcontractors for specialized tasks.

14. On most construction projects, these parties are linked in a web of contractual relationships, with "downstream" parties agreeing to indemnify and hold "upstream" parties harmless for issues that arise out of the downstream party's work. Such indemnity arrangements recognize the reality that downstream parties, i.e., the contractors and subcontractors working at a site, are most closely connected to the day-to-day work being done, and are often in the best position to control and mitigate site-related risks.

15. Insurance coverage for construction projects recognizes the same reality. As a rule, downstream parties – i.e., contractors and subcontractors – are contractually required to maintain liability coverage naming upstream parties as additional insureds, and indemnifying the upstream parties for issues that may arise out of the downstream party's work. Additionally, downstream parties' insurers typically will issue additional-insured endorsements, which are appended to the downstream parties' policies, providing upstream parties with coverage "as required by written contract." This arrangement is documented by the issuance of certificates of insurance. It frees the upstream party's insurers from the nearly impossible task of independently considering each

downstream party's safety record, loss history, and practices on a project-by-project basis, and adjusting ratings and premiums accordingly.

16. Occasionally owners of projects will purchase separate coverage – known as "owners protective insurance" – to provide a separate (additional) layer of protection at a project. This coverage is not intended to supplant the protection afforded by the downstream parties at the project, or the downstream parties' insurers. It is intended to serve as additional protection, *beyond* the protection the owner receives from downstream parties through contractual indemnification or as an additional insured.

17. To keep premiums low, and ensure the economic efficiency of this system, issuers of owners protective coverage often require (as a condition of coverage) that the owner work only with "adequately insured" contractors and subcontractors, and that all contractors and subcontractors on a project have adequate insurance and indemnity agreements in place for the owner's protection. In addition, issuers of owners protective coverage often require owners to obtain certificates of insurance from downstream parties: thus monitoring and checking that the appropriate insurance has, in fact, been obtained.

18. Finally – and importantly – the issuers of owners protective policies typically limit the scope of the coverage they offer, so the policies do not cover business risks, contractually assumed liabilities, and other hazardous events. One way insurers do this is to limit coverage to "bodily injury" or "property damage" caused by an "occurrence." Their policies define "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Their policies define "property damage" to mean "physical injury to tangible property, including all resulting loss of use of that property," or "loss of use of tangible property that is not physically injured." The purpose of these definitions is to limit a

policy's coverage to fortuitous events – i.e., accidents involving third parties that are outside an insured's control – and to bar coverage for intangible economic damages, e.g., economic loss from breach of contract.

19.   The effect of these definitions, under Massachusetts law, is that a general contractor's faulty work is not an "accident," i.e., an "occurrence," and does not give rise to covered "property damage."   *See, e.g., Admiral Ins. Co. v. Tocci Bldg. Corp.*, 594 F. Supp. 3d 201, 203 (D. Mass. 2022) (collecting cases), *aff'd on other grounds*, 120 F.4th 933 (1st Cir. 2024). In other words, the coverage provided by OCP policies is limited, and only extends to damage to property other than the contracted work itself.

## THE BSIC POLICY

### Insuring Agreement

20.   In June 2021, BSIC issued the BSIC Policy to Miller, providing coverage for a designated location at 26 Miller Hill Road, Dover, Massachusetts, i.e., the Home.

21.   The BSIC Policy was in effect from June 18, 2021 until June 18, 2022.  It had liability limits of $1 million per occurrence, $2 million general aggregate.  The Insuring Agreement of the BSIC Policy expressly provides:

> a. We [BSIC] will pay those sums that the insured [Miller] becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages…
>
> b. This insurance applies to "bodily injury" and "property damage" only if
>
> 1. The "bodily injury" or "property damage" is caused by an "occurrence" and arises out of
>
>    (a) Operations performed for you by the "contractor" at the location specified in the Declarations; or
>
>    (b) Your acts or omissions in connection with the general supervision of such operations.
>
> 2. The "bodily injury" or "property damage" occurs during the policy period; and

3. Prior to the policy period, no insured listed under Paragraph 1 of Section II, Who Is An Insured, and no 'employee' authorized by you to give or receive notice of an 'occurrence' or claim, knew that the 'bodily injury' or 'property damage' had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change, or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

DiPierro was the "contractor" designated in the Policy.

22. As noted, the purpose of this Insuring Agreement was to provide Miller with coverage for "property damage," caused by an "occurrence," to the extent that damage arose out of DiPierro's operations, or the operations of DiPierro's subcontractors, or the "general supervision" of DiPierro's operations by Miller at the Project in question.

23. Here, the damages sought in the Underlying Complaint are entirely for faulty work performed by Miller and DiPierro. These allegations do not involve "property damage," caused by an "occurrence," as Massachusetts courts construe those terms. *See Tocci, supra*.

## Business Risk and Other Exclusions

24. Additionally, and alternatively, even if the damages alleged in the Underlying Complaint were (somehow) sufficient to trigger the Policy's Insuring Agreement, coverage for the Chois' alleged damages would be precluded by the Policy's various exclusions and limitations from coverage.

25. Policy Exclusion C ("Work Completed Or Put To Intended Use") provides as follows:
   This insurance does not apply to …

   "Bodily injury" or "property damage" which occurs after the earlier of the following times:

   1. When all "work" on the project (other than service, maintenance or repairs) to be performed for [Miller] by [DiPierro] at the site of the covered operations has been completed; or
   2. When that portion of [DiPierro's] "work," out of which the injury or damage arises, has been put to its intended use by any person or organization, other than another contractor or subcontractor working directly or indirectly for [DiPierro] or as part of the same project.

Here, the Underlying Complaint asserts that the Chois moved into the Home, and "put it to its intended use," soon after the closing date. To the extent this is the case, most or all of the Chois' alleged issues would fall within Exclusion C.

26. Additionally, , Policy Exclusion G ("Damage to Property") reads as follows:

> This insurance does not apply to …
>
> "Property damage" to
>
> 1. Property [Miller] own[s], rent[s] or occup[ies], including any costs or expenses incurred by [Miller], or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property.
> 2. Property loaned to [Miller];
> 3. Personal property in [Miller's] care, custody and control … ; or
> 4. "Work" performed for [Miller] by [DiPierro]."

For purposes of the exclusion, "work" is defined to mean "materials, parts or equipment furnished in connection with [Miller's] operations." To the extent the Underlying Complaint alleges damages which were incurred before Amy and Yumin Choi moved in – i.e., damage to the Home while Miller still "owned" or "occupied" it – that damage would appear to be precluded by Exclusion G(1).

27. Exclusion G(4) is unique to OCP coverage and does not generally appear in commercial general liability ("CGL") policies. It provides that there is no coverage for any "property damage" to "work" performed for Miller by DiPierro, and it is consistent with the general purpose of OCP policies, which are not intended to cover projects being developed by the insured. Since the damage alleged by Amy and Yumin Choi consists entirely of defects in the "work" performed for Miller by DiPierro, this Exclusion bars coverage, even if the Policy's Insuring Agreement were (somehow) deemed to be satisfied.

**Risk Transfer Requirements**

28. Finally, a word must be said about risk transfer. The BSIC Policy – like most owners protective policies – was intended to serve as additional protection, *over and above* the protection Miller was to secure from downstream parties through indemnification or as an additional insured. It was a fundamental assumption on which coverage was based that Miller would have adequate insurance and indemnity agreements in place with downstream parties for its own protection.

29. As part of its arrangement with BSIC, and in consideration of the premium charged, Miller agreed to an Endorsement (the "Contracted Work Endorsement"), which added the following as a condition to coverage:

> 1. As a condition of this insurance, coverage only applies to liability arising out of work performed for you by your "adequately insured" contractors or "adequately insured" subcontractors who:
>    a. Have agreed in writing to hold harmless, defend, and indemnify you from all liability arising out of work performed by or on behalf of all such "adequately insured" contractors and "adequately insured" subcontractors; and
>    b. Have agreed in writing to name you and all insureds as Additional Insured(s) on all Commercial General Liability policies of such "adequately insured" contractors and "adequately insured" subcontractors.
> 2. You will obtain and maintain Certificates of Insurance from all contractors and subcontractors you hire providing evidence of 8.1.a. and 8.1.b. above.

(Emphasis added.) The Endorsement then amended the "Definitions" section of the Policy to provide:

> "Adequately insured" means that the contractors and subcontractors that perform operations for you maintain Commercial General Liability insurance in force with the following minimum limits of insurance for their operations, including operations performed for them by others: ...
>
>> General Aggregate Limit (Other than Products/Completed Operations) -- $2,000,000
>>
>> Each Occurrence Limit -- $1,000,000.

30. Similarly, and to the same effect, the Policy's Contracted Work Endorsement added the following exclusion from coverage:

> 1. This insurance does not apply to "bodily injury" or "property damage" arising out of work performed by any contractors or subcontractors who:
>    a. Are not "adequately insured"; and
>    b. Have not agreed in writing to hold harmless, defend, and indemnify you; and
>    c. Do not agree in writing to name you and all insureds as Additional Insured(s) on their Commercial General Liability policies.
> 2. This insurance does not apply to "bodily injury" or "property damage" for work performed by any contractors or subcontractors unless such work is performed specifically and solely for you.

31. The effect of these conditions, and the associated exclusion from coverage, was that BSIC would not cover Miller for any liability arising out of work performed by contractors or subcontractors, unless those downstream parties [1] had agreed to defend and indemnify Miller from such claims, and [2] maintained CGL coverage of at least $1 million per occurrence, $2 million aggregate, naming Miller named as an additional insured. As a further condition of coverage, Miller was required to obtain and maintain Certificates of Insurance, documenting the contractors' and subcontractors' compliance.

32. Miller did not comply with these conditions. For example, so far as the record shows, there was never any "agreement in writing" between Miller and DiPierro, or any other contractor, under which DiPierro agreed to "hold harmless, defend, and indemnify [Miller]" from liability arising out of DiPierro's work. The contract that DiPierro entered, calling for work to be performed at the Home, was entered with Platt, and it did not contain any indemnity provisions, running to Miller or anyone else.

33. Likewise, so far as the record shows, Miller did not effectively "agree in writing" with DiPierro, or anyone else, that Miller would be named as an additional insured on DiPierro's

-10-

commercial general liability policies, as to "work performed for [Miller] by [DiPierro]." The language of the relevant contract simply says that DiPierro agrees to "to carry liability insurance as is necessary to protect [DiPierro], [its] employees, subcontractors and the Owner(s) from personal injury claims for bodily injury, including death, which may arise from the performance of this Contract by the Contractor." Due, in part, to this ineffective language, BSIC has been forced to defend Miller throughout this action, and Miller has not been able to make a claim for contractual indemnity against the contractor whose faulty work is the source of the alleged issues.

34. In addition, to the extent the Underlying Complaint alleges "property damage" as the result of work performed by DiPierro, that "property damage" does not arise out of contracted work that was done "specifically and solely" for Miller. To the contrary: the work that DiPierro apparently performed was performed by agreement with Platt and other parties. To the extent the liability asserted in the Underlying Complaint is alleged to have arisen out of such "shared" work, this exclusion separately applies, and there is no coverage under the Policy for these claims.

35. The violation of these policy provisions has significantly increased BSIC's exposure to liability, far beyond the risks reflected in the premiums BSIC charged. To the extent Miller has failed to comply with these conditions, it has forfeited coverage, and there will be no protection under the Policy for these claims.

**PLATT'S DEFENSE**

36. In early 2023, Miller tendered this matter to BSIC for coverage under the Policy. On March 21, 2023 and May 5, 2023, BSIC sent Miller a reservation of rights – notwithstanding its grave concerns about coverage – and agreed to defend "[Miller] as well as its alleged members, David Gambone and Kyle Gambone, to the extent that [their] conduct was in furtherance of their duties for the named insured [i.e., Miller]."

37. All of this correspondence took place between BSIC and Miller: Platt was not an insured under the Policy, and did not tender a claim for coverage under the Policy. At no time did BSIC ever agree to defend Platt, or any of Platt's founders, members, officers, principals, in their capacity as such.

38. After receiving BSIC's reservation, Miller insisted on independent counsel, i.e., the law firm of Lawson & Weitzen, to represent its interests in the Underlying Litigation. Platt appears to have hired the same law firm. On May 31, 2023, Lawson & Weitzen entered appearances in the Underlying Action for Miller, Platt, and the Gambones.

39. Thereafter, and for the last several years, the Lawson & Weitzen firm has periodically submitted invoices to BSIC. Berkeley has paid these invoices, understanding and believing that they reflected the scope of defense agreed under reservation, i.e., a defense of "26 Miller Road LLC and its alleged members."

40. In late 2025, it came to BSIC's attention that a number of the invoices Lawson & Weitzen had submitted were not limited to work for Miller, but also included work done for Platt – which was not an insured under the Policy – and for the Gambones in their capacity as "members" or "managers" of Platt.

41. On December 24, 2025, BSIC reached out by e-mail to Lawson & Weitzen. It attached its May 5, 2023, correspondence, and made clear that Platt was not an insured under the Policy, and said it would no longer fund Platt's defense.

42. On January 5, 2026, Lawson & Weitzen responded to this e-mail, asserting – for the first time, without any support – that Platt was Miller's "real estate manager," and qualified as an insured under the Policy. Additionally, Lawson & Weitzen's letter took the position that BSIC

-12-

had, somehow, waived its rights or was estopped from discontinuing coverage to Platt. Lawson & Weitzen demanded that Platt's defense be continued.

## COUNT I

### Declaratory Judgment – Insuring Agreement

43. BSIC re-alleges and incorporates by reference paragraphs 1 through 42, above, as if fully set forth herein.

42. The allegations set forth against Defendants in the Underlying Complaint involve faulty work and economic loss. They do not constitute "property damage," caused by an "occurrence," within the meaning of the Policy's Insuring Agreement.

43. As a result, BSIC is entitled to a declaration that it is not obligated to defend or indemnify any of the Defendants in the Underlying Action.

44. There exists an actual and justiciable controversy between BSIC and Defendants as to these matters, as to which BSIC has no adequate remedy at law.

## COUNT II

### Declaratory Judgment – Policy Conditions

45. BSIC re-alleges and incorporates by reference paragraphs 1 through 44, above, as if fully set forth herein.

46. Miller has breached the conditions of the Policy's Contracted Work Endorsement by, e.g., [1] failing to require downstream parties to defend and indemnify it; [2] failing to require these downstream entities to maintain CGL coverage naming it as an additional insured; and [3] failing to obtain and maintain Certificates of Insurance, documenting the downstream entities' compliance with the Policy's risk transfer requirements.

47. As a result of this breach, BSIC is entitled to a declaration that it is not obligated to defend or indemnify Defendants in the Underlying Action.

48. There exists an actual and justiciable controversy between BSIC and Defendants as to these matters, as to which BSIC has no adequate remedy at law.

## COUNT III

### Declaratory Judgment – Policy Exclusions

49. BSIC re-alleges and incorporates by reference paragraphs 1 through 48, above, as if fully set forth herein.

50. The claims asserted in the Underlying Action fall within the BSIC Policy's Contracted Work Exclusion, insofar as downstream parties [1] are not "adequately insured," or [2] have not agreed in writing to hold harmless, defend, and indemnify Miller; or [3] have not agreed in writing to name Miller as Additional Insureds on their CGL policies. In addition, to the extent that the claims in the Underlying Action can be understood to allege "property damage," that "property damage" appears to arise out of contracted work that was not done "specifically and solely" for Miller.

51. In addition, many of the claims asserted in the Underlying Action fall within the Policy's other exclusions and limitations from coverage, including – but not limited to – the Policy's Mold and Business Risk Exclusions.

52. As a result of these Exclusions, BSIC is entitled to a declaration that it is not obligated to defend or indemnify Defendants, in whole or in part, for the claims asserted in the Underlying Action.

53. There exists an actual and justiciable controversy between BSIC and Defendants as to these matters, as to which BSIC has no adequate remedy at law.

## COUNT IV

### Unjust Enrichment

54. BSIC re-alleges and incorporates by reference paragraphs 1 through 53, above, as if fully set forth herein.

55. BSIC's reservation correspondence – dated March 21, 2023 and May 5, 2023 – agreed to defend "[Miller] as well as its alleged members, David Gambone and Kyle Gambone, to the extent that [their] conduct was in furtherance of their duties for the named insured [i.e., Miller]." Platt is not an insured under the Policy, and neither Platt nor its alleged members are entitled to a defense under the Policy.

56. At no time did BSIC explicitly agree to defend Platt, or any of Platt's founders, members, officers, principals, in their capacity as such.

57. For the last several years, Miller's counsel has wrongfully submitted invoices to BSIC that included work done for Platt, and for the Gambones in their capacity as Platt's members and officers, and otherwise exceeded the scope of the defense Berkeley had agreed to provide under reservation.

58. For the last several years, BSIC paid these invoices, understanding and believing that they reflected the scope of defense agreed under reservation, i.e., a defense of "26 Miller Road LLC and its alleged members."

59. The submission of these invoices was not authorized nor agreed by BSIC, and is not warranted, given the fact that Platt is not an insured under the Policy.

60. BSIC is entitled to a declaration that it is not obligated to defend or indemnify Platt, or the Gambones as members and officers of Platt, in connection with the claims brought in the

Underlying Action. In addition, BSIC is entitled to damages, in the amount of the defense costs wrongly advanced under its Policy.

61. There exists an actual and justiciable controversy between BSIC and Defendants as to these matters, as to which BSIC has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, BSIC prays for judgment as follows:

A. On Counts I - III, a declaration that BSIC has no duty to defend Miller, Platt, or the Gambones, as to the claims set out in the Underlying Complaint;

B. On Counts I - III, a declaration that BSIC has no duty to indemnify Miller, Platt, or the Gambones, as to the claims set out in the Underlying Complaint;

C. On Count IV, a declaration that BSIC has no duty to defend or indemnify Platt, which has not tendered defense, is not an insured, and is not entitled to coverage under the terms of the Policy;

D. On Count IV, an award of damages to BSIC, in the amount of the defense costs wrongly advanced for Platt's defense since the tender of this action; and

E. Such other and further relief as is just and proper.

-17-

                                    Respectfully submitted,

                                    BERKLEY SPECIALTY INSURANCE COMPANY

                                    By counsel,

/s/ *Austin D. Moody*_____
Austin D. Moody (BBO #704315)
Eric B. Hermanson (BBO #560256)
WHITE AND WILLIAMS LLP
101 Arch Street, Suite 1930
Boston MA  02110-1103
Telephone: (617) 748-5200
Fax: (617) 748-5201
moodya@whiteandwilliams.com
hermansone@whiteandwilliams.com

Dated: February 12, 2026

## **CERTIFICATE OF SERVICE**

      I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on this 12th day of February 2026.

                                               */s/ Austin D. Moody*
                                               Austin D. Moody